IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
EASTERN DIVISION

STEVEN M. ST. CLAIR,                    :          Case No. 1:13-CV-02045

    PLAINTIFF,                          :

    vs.                                 :

COMMISSIONER OF SOCIAL SECURITY,        :          MAGISTRATE'S REPORT AND
                                                   RECOMMENDATION
    DEFENDANT.                          :

## I. INTRODUCTION.

This case was automatically referred to the undersigned Magistrate Judge for report and recommendation pursuant to 72.2(b)(2) of the UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO LOCAL CIVIL RULES.  Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of Defendant's final determination denying his claims for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act) and Supplemental Security Income (SSI) under Title XVI of the Act.  Pending are the Briefs of the parties and Plaintiff's Reply (Docket Nos. 14, 15 & 16).  For the reasons set forth below, the Magistrate recommends that the Court affirm the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

On March 14, 2012, counsel completed an internet application for SSI and federally administered benefits (Docket No. 12, pp. 198-225 of 767).  In the SSI application summary

completed on March 15, 2012, Plaintiff claimed that his disability began on September 1, 2010[1] (Docket No. 12, pp. 295-301 of 767).  Plaintiff also completed a DIB application summary on March 15, 2012, stating that he had become unable to work because of his disabling condition as early as June 6, 1998[2] (Docket No. 12, pp. 303-306 of 767).  The applications for Title II and Title XVI benefits were denied initially on May 25, 2012 (Docket No. 12, pp. 226-228, 233-235 of 767), and upon reconsideration on August 8, 2012 (Docket No. 12, pp. 247-248, 253-254 of 767).

On October 4, 2012, Plaintiff, through counsel, filed a request for hearing (Docket No. 12, pp. 258-259 of 767).  On March 18, 2013, Plaintiff, represented by counsel, and Vocational Expert (VE) Robert Mosley, CRC, LPC, LCLCP, appeared via video teleconference in Lorain, Ohio, and testified before Administrative Law Judge (ALJ) Peter Beekman (Docket No. 12, pp. 49, 260 of 767).  On April 5, 2013, the ALJ rendered an unfavorable decision, finding that Plaintiff was not entitled to a period of disability and DIB (Docket No. 12, pp. 22-42 of 767).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review of the ALJ's decision on July 19, 2013 (Docket No. 12, pp. 6-8 of 767).

Plaintiff timely filed a Complaint seeking judicial review of the Commissioner's decision denying benefits (Docket No. 1).  Defendant filed Answer to the Complaint (Docket No. 11).

### III. FACTUAL BACKGROUND

### A.    PLAINTIFF'S TESTIMONY.

---

[1]

SSI is a supplemental program of last resort for people with no other source of income.  42. U.S.C. § 1382 (Thomson Reuters 2014).  Under SSI, the claimant's entitlement to benefits begins the month following the date of filing the application forward.  There is no period of time during which the claimant must be insured.  20 C.F.R. §§ 416.202, 416.203(b), 416.335 (Thomson Reuters 2014).

[2]

In order to receive DIB, Plaintiff must show that he or she became disabled during a period  when he was insured.  42 U.S.C. §§ 423(a)(1)(A), 423(c)(1) (Thomson Reuters 2014).

Plaintiff was 32 years of age; 6'2" tall and weighed 355 pounds.  He completed the twelfth grade but failed to earn sufficient credits required to earn a diploma.  Plaintiff resided in a shelter intermittently since 1998 (Docket No. 12, pp. 52, 57, 61 of 767).

Plaintiff's work history included jobs at a carnival, two fast food restaurants, a factory and a backyard.  Plaintiff had seasonal jobs at the carnival from 1998 up until 2005.  He could no longer work there because of his inability to lift heavy objects.  The longest time he worked in the fast food industry was four months.  He was not suited for this job because of his inability to concentrate and complete his tasks consistently.  Plaintiff was discharged from his factory job because of his inability to work well with the line leader.  He removed leaves, small branches and debris from the backyard even though he tended to lack focus and entertain thoughts unrelated to the tasks at hand (Docket No. 12, pp. 62, 63, 64, 65-66, 74 of 767).

When accounting for the state of his health, Plaintiff described it as generally "crappy."  He suffered with the symptoms of Attention Deficit Hyperactivity Disorder (ADHD); epileptic seizures that were progressive in intensity and severity; abnormal curvature of the spin and no cartilage in his knees  During the two years preceding the hearing, Plaintiff developed two blood clots.  Moreover, there was evidence of psychosis (Docket No. 12, p. 53 of 767).

Plaintiff was not taking any medication for ADHD (Docket No. 12, p. 68 of 767).  Plaintiff had difficulty focusing, most notably when trying to read.  Accordingly, his ability to process and comprehend what he read was adversely affected.  Plaintiff was easily distracted and he could not sit undisturbed and watch television more than 15 minutes before losing attention.  Plaintiff recalled that he was discharged from a job core program because he simply could not focus or peaceably co-exist withe the other participants (Docket No. 12, pp. 54, 57, 59-60, 61,68 of 767).

With respect to the blood clots, Plaintiff had one in his right leg and one in his right lung.

3

Walking, sitting and standing too long caused leg numbness.  Plaintiff could not bend his leg and lifting and picking his leg up past mid-shin was problematic.  Plaintiff had undergone split lung transplantation but he was not taking a blood thinner because he could not get to the clinic twice weekly for monitoring.  In addition, Plaintiff suffered from permanent nerve damage to the back of his right knee after being hit with a bottle.  Plaintiff had not undergone surgery to correct the curvature of the spine (Docket No. 12, pp. 54, 55-56, 67, 68 of 767).

Although he never had a grand mal seizure, he explained that the seizures were dramatic, during which his body convulsed, his brain shut down, his memory was "jostled" and he was generally incoherent[3].  Plaintiff took Tegretol, a medication designed to treat different types of seizures.  This medication suppressed the nerve impulses but did not stop the seizures (Docket No. 12, pp. 53-54, 71 of 767; www.drugs.com/tegretol.html).

Plaintiff recalled treating with a psychiatrist after he was discovered walking down the middle of the road.  To the best of his recollection, Plaintiff was admitted to the psychiatric hospital when he was 19 years of age after a break-up with his girlfriend.  The medical records showed subsequent hospitalizations of mental health treatment in 2001 and 2003.  Plaintiff claimed to have auditory and visual hallucinations daily (Docket No. 12, pp. 70, 71 of 767).

During a typical day, Plaintiff took care of his hygiene and with the exception of putting on his socks, he could dress and feed himself.  Regulations dictated that Plaintiff had to vacate the shelter in which he resided by 8:00 A.M.  Plaintiff walked or caught a ride to the library or his

---

[3]

On March 18, 2013, Plaintiff's fiancé, Joanne Mattheis, signed a declaration that she, too, resided in the shelter. Accordingly, she spent most of her days with Plaintiff.  She explained that when Plaintiff has a seizure, his right hand shakes, his eyes close and he becomes unresponsive.  "Bad seizures" last up to 15 minutes accompanied by more shakiness.  Once she observed him have a seizure while standing.  Plaintiff fell to the floor and hit his head.  It was likely that if Plaintiff became aggravated or angry, he would have a seizure within the next 12 hours (Docket No. 12, p. 758 of 767).  Attached to her declaration were calendars for March, April, May, July, August, September, October, November, and December 2012. Ms. Mattheis recorded the seizures by date and the length of the seizure (Docket No. 12, pp. 759-767 of 767).

daughter's school.  If walking, he stopped to take a break at every five blocks.  At the library, Plaintiff used the computer to play games or conduct research.  At his daughter's school, he "hung out" until he could have lunch with his daughter in the cafeteria.  Plaintiff returned to the shelter at 5:00 P.M., had dinner, cleaned up, watched television and was in bed by 11:00 P.M. (Docket No. 12, pp. 55, 56, 57 of 767).

**B.**     **THE VE'S TESTIMONY**.

The VE categorized Plaintiff's previous employment by (1) DICTIONARY OF OCCUPATIONAL TITLES (DOT) number, a universal classification of occupational definitions and how the occupations are performed; (2) exertional level, the amount of strength required in a particular job; (3) skill level, or the knowledge of tasks that requires judgment and is attained through job performance; and (4) specific vocational preparation (SVP), or the amount of lapsed time required by typical worker to learn the techniques, acquire the information and develop the facility needed for average performance in a specific job (Docket No. 12, p. 75 of 767; Www.occupationalinfo.org; Www.onetonline.org).

| JOB & DOT | EXERTIONAL LEVEL | SKILL LEVEL | SVP |
|---|---|---|---|
| General inspector 609.684-010 | Light work involves a good deal of standing and walking; lifting no more than 20 pounds at a time with frequent lifting or carry of objects weighing up to 10 pounds.  20 C. F. R. §§ 404.1567(b), 416.967(b). | Semi-skilled work requires some skills but doesn't include complex job functions.  20 C.F.R.  §§  404.1568(b); 416.968(b). | 4--Over three months up to and including six months. Www.occupationalinfo.org. |
| Carnival laborer 869.687-026 | Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  20 C.F.R. §§ 404.1567(e); 416.967(e). | Unskilled work requires little or no judgment to perform simple tasks and can usually be learned in less than a month. 20 C.F.R. §§ 404.1568(a); 416.968(a). | 2–Anything beyond a short demonstration up to and including one month. Www.occupationalinfo.org. |
| Fast food worker 311.472-010 | Light work | Unskilled work | 2 |

(Docket No. 12, p. 75 of 767).

The ALJ posed the following hypothetical:

Consider a hypothetical individual of Plaintiff's age, education, work experience and residual functional capacity to lift and/or carry up to twenty-five pounds occasionally and ten pounds frequently; with the ability to:  (1) stand and/or walk six out of eight hours a day, a half hour at a time; (2) sit six out of eight hours a day, two hours at a time; (3) frequently push/pull and frequently foot pedal; (4) occasionally use a ramp or stairs, but never a ladder, rope, or a scaffolds, (5) frequently crouch, never crawl; (6) no manipulative visual or communications deficits; (7) avoid high concentration of smoke, fumes, dust and pollutants; (8) should avoid entirely unprotected heights and dangerous machinery; (9) should do simple routine tasks that are low-stress, without production quotas, pace rate work or work involving arbitration, confrontation, negotiation or supervision.

The VE offered three sedentary, unskilled jobs that have a SVP of anything beyond a short demonstration and up to and including six months, and are available in numbers sufficient to accommodate Plaintiff with his impairments (Docket No. 12, pp. 75-76 of 787).

| Job | Region | State | National |
|---|---|---|---|
| DOWEL INSPECTOR/FILM TOUCH INSPECTOR/TOUCH UP SCREENER DOT 669.687-010/726/684-050/726.684-110 | 1,500 | 6,000 | 200,000 |
| SURVEILLANCE MONITOR DOT 379.367-010 | 500 | 3,000 | >100,000 |
| CUFF FOLDER DOT 685.687-014 | 1,500 | 6,000 | >200,000 |

(Docket No. 12, pp. 76-77 of 470).

In the second hypothetical, the ALJ posed the same capabilities and limitations except for the stand/walk limitations.  The VE opined that the jobs would be the same (Docket No. 12, pp. 77-78 of 767).

Upon examination by counsel, the VE explained that the nature of jobs listed above required attention to the job and very little reading and writing would be involved in the dowel inspector and cuff folder positions.  There would be some writing involved as far as the surveillance system monitor position (Docket No. 12, p. 82 of 767).

### IV.  EDUCATIONAL BACKGROUND.

6

Plaintiff's psychological problems date back to his youth.  Shortly after his 13th birthday, he was removed from a group home and placed in a treatment program at Boy's Village, an inpatient behavioral health treatment facility, for acting out behaviorally and sexually.  He was a resident from June 23, 1993 through January 11, 1994.  The only health problems he had at that time were suspected intestinal parasites; otherwise, Plaintiff had significant difficulty understanding boundaries and gaining control of his sexual impulses (Docket No. 12, pp. 407, 411-418 of 767).

After one month in the program, it was determined that Plaintiff's stay would be extended for 30 days so that Plaintiff could continue to work on decreasing negative attention seeking behaviors and seeking peer acceptance in positive ways.  Plaintiff was participating in individual and group therapies.  Family therapy had been scheduled (Docket No. 12, pp. 428-432 of 767).

After one and a half months in the program, consulting psychiatrist, Dr. Samuel Tambyraja, M.D., identified Plaintiff as an extremely troubled "youngster" with significant problems, highly immature social interaction and significant attentional problems.  Diagnostic possibilities included pervasive developmental disorder and ADHD.  Consideration was given to placing Plaintiff on Ritalin but reports indicated that it had caused increased problems in the past (Docket No. 12, pp. 407-425 of 767).

After two months, Plaintiff was an unhappy youth with a pessimistic outlook on life.  The consulting psychologist, Ralph Buterbaugh, M. A., recommended a treatment plan that incorporated methodologies designed to provide positive attention.  He also suggested a trial period of medication to coincide with beginning of the following school year (Docket No. 12, pp. 426-417 of 767).

After three months into the program, Plaintiff had issues with distractibility and socially inappropriate behaviors.  After four months in the program, Plaintiff was falling behind in his educational work and he had an excessive number of discipline plans.

7

During his six- month tenure, Plaintiff never worked his way off "grounding" status despite being placed on cottage shut down, strict eyeball supervision and separation from his peers (Docket No. 12, pp. 407, 411, 412-422, 428 of 767).

Plaintiff was in foster care while attending Lorain Admiral King Senior High School in the ninth and tenth grades in 1995 and 1996. He performed poorly in English, biology, United States history, health, construction, American government and transition classes. Yet, Plaintiff was able to speak in complete grammatically correct sentences, his vocabulary was at or above grade level and he was considered quite knowledgeable about a lot of topics. In his individualized education program, the curriculum was adjusted to assist with math, comprehension, written expression and appropriate behavior skills (Docket No. 12, pp. 737, 739, 741-743 of 767).

### V. MEDICAL EVIDENCE.

On May 13, 2000, Plaintiff was transferred to Community Health Partners (CHP) from the emergency room for an expression of vague suicide ideation, most likely precipitated by the crisis of homelessness. Dr. M. Gordillo, M.D., proceeded with suicide precautions, placing Plaintiff in full restraints and locked him up in the seclusion room. Thereafter, Dr. Gordillo conducted a course of treatment consistent with a pattern of adjustment disorder. The results from the laboratory and diagnostic tests were largely unremarkable, thereby confirming Plaintiff's claim that he had no physical problems. Plaintiff was discharged on June 16, 2000, to the Guidance Haven Center. Dr. Gordillo made the following discharge diagnosis using the standard criteria for the classification of mental disorders:

| THE FIVE AXIS MODEL IS DESIGNED TO PROVIDE A COMPREHENSIVE DIAGNOSIS THAT INCLUDES A COMPLETE PICTURE OF NOT JUST ACUTE SYMPTOMS BUT OF THE ENTIRE SCOPE OF FACTORS THAT ACCOUNT FOR A PATIENT'S MENTAL HEALTH. | DR. GORDILLO'S IMPRESSIONS OF PLAINTIFF'S MENTAL STATUS. |
|---|---|

| I. Clinical Disorders<br>This represents acute symptoms that need treatment. | Plaintiff has an adjustment disorder with depressed mood. |
|---|---|
| II. Personality Disorders and Intellectual Disabilities<br>Axis II is for assessing personality disorders and intellectual disabilities.  These disorders are usually life-long problems that first arise in childhood, distinct from the clinical disorders of Axis I which are often symptomatic of Axis II. | Plaintiff has a personality disorder, not otherwise specified (NOS). |
| III. General Medical Condition<br>Axis III describes physical problems that may be relevant to diagnosing and treating mental disorders. | No acute disease. |
| IV. Psychosocial and environmental Disorders<br>Axis IV reports psychosocial and environmental stressors that may affect the diagnosis, treatment, and prognosis of mental disorders | Homelessness. |
| V.  The Global Assessment of Functioning Scale (GAF)<br>The GAF is a numeric score used by mental health clinicians and physicians to rate subjectively, the social, occupational and psychological functioning of adults. | 50.  If symptoms are present, they are serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or there is a serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work).   Www.globalassessmentof functioningscale.com. |

(Docket No. 12, pp. 442-444 of 767).

Plaintiff lifted something heavy and he presented to the CHP on February 19, 2002, for a "hurt back."  Plaintiff was given Tylenol for pain (Docket No. 12, pp. 461-464 of 767).

Plaintiff was admitted to CHP on December 26, 2002, with pain in his sacral area.  Plaintiff was discharged with a muscle relaxer and instructions to use heat and cold in the affected area (Docket No. 12, pp. 447-451 of 767).

Plaintiff presented to CHP on December 18, 2003, for treatment of an injury to his left eye sustained in an assault.  The wound was cleaned with medication used to prevent infection (Docket No. 12, pp. 454-457 of 767).

Plaintiff presented to CHP on March 20, 2004, with a small hematoma on the left temple and a laceration on his arm/hand.  Diagnostic tests were performed on Plaintiff's right hand, head and cervical spine.  There was no acute fracture or dislocation in the hand, the brain was normal in size and configuration and there was no evidence of disease.  There was evidence of some trauma in the

cervical spine but further correlation was warranted.  Plaintiff's injuries were cleaned with medication used to treat and prevent infection and he was given pain medication (Docket No. 11, pp. 457-476 of 767).

Plaintiff was treated at CHP for "no feeling in his right arm" on March 31, 2004.  Diagnosed with a sprained elbow, Plaintiff was given a pain reliever and muscle relaxer (Docket No. 12, pp. 479-483 of 767).

Plaintiff did not return to CHP until August 11, 2004, complaining of back pain.  Diagnosed with thoracic strain, he was given a muscle relaxer and pain reliever.  A dental abscess was detected for which Plaintiff was given an antibiotic (Docket No. 12, pp. 486-492 of 767).

On November 29, 2004, Plaintiff presented to the Lorain County Free Clinic (LCFC).  Ms. Sue Perry, R.N., conducted a general review of Plaintiff's systems, noting that Plaintiff's present illnesses were seizures, right knee pain, scoliosis and dental disease.  The attending physician made a dental referral and ordered diagnostic tests of the right knee and thoracic lumbar spine (Docket No. 11, pp. 663, 682 of 767).

On August 24, 2006, Plaintiff presented to the CHP emergency room with a closed head injury derived from a fall.  Plaintiff had a laceration of the left forehead and elbow and a contusion of the left shoulder/clavicle.  The diagnostic tests were negative for brain defect, trauma to the cervical spine or abnormal morphology of the left clavicle and left shoulder.  Plaintiff's pain was managed with Tylenol, codeine and Demerol (Docket No. 12, pp. 502-510 of 767).  On August 28, 2006, Plaintiff presented to the LCFC for removal of the stitches (Docket No. 12, p. 680 of 767).

While committed to the custody of the Lorain County Sheriff's Office, Plaintiff suffered from anxiety and he tried to persuade psychologist, Dr. Deborah Koricke to increase the dosage of Zoloft; an antidepressant.  The attending physician also refused to increase the dosage.  Plaintiff resorted to

10

bizarre behaviors while in jail, namely, carving the letter "J" in his abdomen during February 2008. On March 7, 2008, Plaintiff reported that the area around the carving was red and swollen and that he had an abscess on the abdomen.  Plaintiff was placed in medical isolation until the cultures from the skin abscess were tested.  The results showed the presence of a bacterial infection (Docket No. 12, pp. 542-543, 547-548, 552 of 767; STEDMAN'S MEDICAL DICTIONARY, 2006 WL 384628 (2006).

On March 21, 2008, Dr. M. Ahmed conducted an evaluation using the standard criteria to classify Plaintiff's mental disorders:

| THE FIVE AXIS MODEL USED TO ACCOUNT FOR THE PATIENT'S MENTAL HEALTH. | DR. AHMED'S IMPRESSIONS OF PLAINTIFF'S MENTAL STATUS. |
|---|---|
| I.  Clinical Disorders | Adjustment disorder and alcohol abuse |
| II. Personality Disorders and Intellectual Disabilities | Deferred |
| III. General Medical Condition | None. |
| IV. Psychosocial and environmental Disorders | Legal and homelessness |
| V.  The GAF | 69 or Some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well. |

(Docket No. 11, pp. 539-540 of 767).

Dr. Koricke, the consulting psychologist, conducted an examination on March 28, 2008. Although mildly disheveled, Plaintiff's mental status was considered normal (Docket No. 12, p. 538 of 767).

Plaintiff presented to the Community Regional Medical Center (CRMC) on June 2, 2008 with a possible head injury, an abrasion of the left wrist, an infection of the hair follicles and a scalp abrasion.  The abrasions were cleaned, sutured and diagnostic tests were administered to rule out a hemorrhage in the brain.  There was a questionable fracture off the left dorsal surface of the carpal

bones but there was no acute intracranial process in the brain. (Docket No. 12, pp. 513-521 of 767).

Plaintiff needed anti-seizure medication and on August 29, 2008, he presented to LCFC for refills.  Apparently the last seizure he had was in March 2008.  In addition, Plaintiff was prescribed a diuretic and a non-steroidal anti-inflammatory drug (Docket No. 12, p. 679 of 767).

In June 2009, Plaintiff presented to the LCFC wearing a friend's glasses.  The attending physician determined that in addition to a dental examination, Plaintiff needed an eye examination (Docket No. 12, p. 678 of 767).

Plaintiff presented to the LCFC on October 26, 2009, complaining of an infection in the left upper side of his mouth.  The treating physician attributed the infection to a dental abscess and prescribed an antibiotic and referred Plaintiff for dental surgery (Docket No. 12, p. 677 of 767).

Plaintiff presented to the LCFC on December 14, 2009, complaining that the current anti-seizure medication was ineffective because he had seven seizures.  Tegretol®, an anticonvulsant and specific analgesic for neuralgia, was prescribed to treat the seizures (Docket No. 12, p. 676 of 767; STEDMAN'S MEDICAL DICTIONARY, 2006 WL 383235 (2006)).

At the LCFC, Plaintiff was treated for a cough and difficulty breathing on January 27, 2010 (Docket No. 12, p. 675 of 767).

On March 10, 2010, Plaintiff was admitted to CRMC with right leg pain, swelling and redness.  An ultrasound confirmed the presence of acute deep vein thrombosis (DVT) within the right superficial femoral and popliteal veins.  His discharge medications included an anticoagulant (Docket No. 12, pp. 524-532, 612-617 of 767).

Plaintiff underwent oral anticoagulant therapy to prevent existing clots from growing and/or the formation of new clots.  To test whether the anti-coagulant was successful in reducing blood clots, blood samples were collected for testing on March 27, 2010, May 17, 2010, May 26, 2010, June 24,

2010, June 30, 2010, July 13, 2010, July 29, 2010, August 13, 2010 and August 19, 2010.  The clinical

application of these tests was that there was no clotting or side effects (Docket No. 12, pp. 561-569,

683-687 of 767).

> While undergoing anti-coagulant therapy, Plaintiff also treated at CRMC and LCFC for:

> (1)     Right upper jaw pain likely caused by dental abscess and painful wisdom teeth (Docket
>         No. 12, pp. 570-571, 579, 672, 673 of 767).
> (2)     Swollen right leg and painful ankle (Docket No. 12, pp. 572, 674 of 767).
> (3)     Coughing and dyspnea (Docket No. 12, p. 573 of 767).
> (4)     Seizures (Docket No. 12, pp. 574, 579 of 767).
> (5)     Oral infection (Docket No. 12, pp. 575, 576 of 767).
> (6)     Left shoulder pain, eyebrow laceration and elbow abrasion (Docket No. 12, p. 577 of
>         767).
> (7)     Skin rash (Docket No. 12, p. 578 of 767).

> Plaintiff presented to the LCFC on August 26, 2010, complaining of pain and swelling in the

right lower leg.  Unable to afford medical care, Plaintiff refused an emergency room treatment or a

prescription for Ultram, a medication used to relieve muscle spasm.  Rather, he opted to wear Jobst

stockings and take Ibuprofen for pain (Docket No. 12, p. 668 of 767).

> Plaintiff presented to CRMC with dyspnea and chest pain on September 19, 2010.  The

diagnostic evidence was positive for pulmonary embolism, with possible pulmonary infarct.  There

was also evidence of small atelectasis/infiltrate at the right base of the lung (Docket No. 12, pp. 610-

611 of 767).

> On September 22, 2010, Dr. Scott McCallister, M. D., a cardiologist, implanted a medical

device used to prevent life threatening pulmonary embolism (Docket No. 12, pp. 582-595, 596-599,

600-602, 611 of 767; www.healthgrades/physician/dr-scott-mccallister).

> Pursuant to a referral by the Bureau of Disability Determination, psychologist, James N.

Spindler, M.S., performed a clinical interview on March 10, 2011, to assess mental status.  He made

some key observations:

(1)     Plaintiff said he heard voices which seem negative and angry (Mr. Spindler attributed this to a history of polysubstance dependence and a depressive disorder with psychotic features).

(2)     Plaintiff appeared to be functioning on the average range of intelligence.

(3)     Plaintiff had average grooming habits.

(4)     Plaintiff's speech was normal in rate and volume and he had not difficulty staying focused.

(5)     Plaintiff appeared mildly depressed.

(6)     Plaintiff admitted that he occasionally feels anxious or frightened.

(7)     Plaintiff knows how to shop, he has an adequate level of knowledge for most aspects of daily living and his judgment seems adequate for routine matters.

Overall, Mr. Spindler determined that Plaintiff's most serious mental symptoms were his drug dependence, feelings of worthlessness, auditory hallucinations and varying levels of depression for at least a part of the day.  Mr. Spindler concluded that:

(1)     Plaintiff's clinical GAF was 40, a score that is indicative of some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school); (

(2)     Plaintiff's functional GAF was a 61, a score that denoted some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

(3)     Plaintiff's final and current GAF was 40

(4)     Plaintiff's mental ability to relate to others was mildly impaired due to his depressive disorder.

(5)     Plaintiff's mental ability to understand, remember and follow instructions was not impaired.

(6)     Plaintiff's mental ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks is not impaired.

(7)     Plaintiff's ability to withstand the stress and pressure associated with day-to-day work activities is mildly impaired due to his depressive disorder.

(8)     Plaintiff had the mental ability to manage his funds (Docket No. 11, pp. 643-648 of 767).

On March 30, 2011, Plaintiff presented to the LCFC complaining of raised red bumps on his

14

upper and lower extremities, right leg swelling and redness and Homan's sign[4] without pain.  The seizure medication was continued (Docket No. 12, pp. 666-667 of 767).

On April 15, 2011, Dr. Darshan Mahajan, M. D., a neurologist, completed an initial examination to determine the cause of Plaintiff's seizures and scoliosis.  Diagnosing Plaintiff with localization-related (focal) (partial) epilepsy and epileptic syndromes, Dr. Mahajan considered that Plaintiff's medical conditions affected his functional capacity accordingly:

    (1)    Plaintiff could stand/walk 4 hours in a 6-hour workday, ½ hour without interruption.
    (2)    Plaintiff could sit eight hours in an 8-hour workday, ½ hour without interruption.
    (3)    Plaintiff could lift/carry up to 25 pounds frequently and occasionally.
    (4)    Plaintiff was moderately limited in pushing and pulling and bending (Docket No. 12, pp. 651-654, 753-754 of 767; www.healthgrades.com/physician/dr-dashan-mahajan).

On April 22, 2011, Plaintiff presented to Dr. Zenos Vangelos, M.D., a sports medicine specialist, at the Cleveland Clinic, Department of Orthopaedics.  Plaintiff complained that he had bilateral knee pain which had persisted for 26 of his 30 years.  The diagnostic evidence showed small ossicles of both tibial tuberosities suggesting previous injury such as Osgood-Schlatter[5].  Dr. Vangelos recommended extreme weight loss and physical therapy for training in home modalities (Docket No. 12, pp. 657-662 of 767; www.healthgrades.com/physician/dr-zenos-vanelos).

Plaintiff presented to the LCFC on April 27, 2011, complaining of itching, bilateral knee pain and pain in the left lumbar area.  His medications were replenished (Docket No. 12, p. 665 of 767).

On July 9, 2011, Dr. Wilfredo M. Paras, M.D., an internal medicine specialist, conducted a one-time internal medicine disability examination in which he opined that Plaintiff had a history of

---

[4]

    Homans's sign is often used in the diagnosis of DVT of the leg.  A positive Homans's sign (calf pain at dorsiflexion of the foot) is thought to be associated with the presence of thrombosis.  However, Homans's sign has a very poor predictive value for the presence or absence of DVT, like any other symptom or clinical sign of this disease.  Www ncbi.nlm nih.gov/pubmed/10525599.

[5]

    Osgood-Schlatter disease is the inflammation of the growth center (apophysis) that forms the tibial tubercle. STEDMAN'S MEDICAL DICTIONARY 116330 (2006).

15

bilateral knee pain, a learning disability with Attention Deficit Disorder and that his main problem was a seizure disorder which was controlled with Tegretol.  Dr. Paras opined that Plaintiff's ability to perform work-related physical and mental activities appeared to be **very** limited by his problems with epilepsy and seizures, his problems with a learning disability disorder with ADD and difficulty focusing, reading, spelling and math and his short and long-term memory loss (Docket No. 12, pp. 689 -691 of 767; www.healthgrades.com/physician/dr-wilfredo-paras).

Dr. Paras also performed a manual muscle test and made the following determinations:

(1)     Plaintiff could raise his shoulders, elbows, wrists, fingers, hips, knees and feet against minimal/moderate resistance as well as against gravity.
(2)     Plaintiff had normal grasp, manipulation, pinch and coordination abilities in both hands.
(3)     Plaintiff had normal range of motion in the cervical spine, wrists, hands-fingers and ankles (Docket No. 12, pp. 692-695 of 767).

On January 12, 2012, Plaintiff admitted that he had not been compliant with the Dilantin primarily because it was ineffective in controlling his seizures.  He requested Tegretol (Docket No. 12, p. 664 of 767).

Dr. Thomas F. Zeck, Ph.d., psychologist, conducted a clinical interview on March 12, 2012, which was based primarily on Plaintiff's recitation of his history and systems.  Dr. Zeck made the following diagnostic impressions using the DSM:

| THE FIVE AXIS MODEL USED TO ACCOUNT FOR THE PATIENT'S MENTAL HEALTH. | DR. ZECK'S IMPRESSIONS OF PLAINTIFF'S MENTAL STATUS. |
|---|---|
| I.  Clinical Disorders | Depressive disorder NOS. |
| II. Personality Disorders and Intellectual Disabilities | No diagnoses. |
| III. General Medical Condition | Epilepsy, scoliosis, knee problems, blood clots. |
| IV. Psychosocial and environmental Disorders | Health issues, homelessness and financial issues. |

16

| V.  The GAF | 55-Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g.. few friends, conflicts with peers or co-workers). |
|---|---|

Moreover, Dr. Zeck opined that Plaintiff straddles the fence between low average and borderline ranges of intelligence classification; that Plaintiff had the ability, at least psychologically, to perform simple tasks and possibly multi-step tasks, that Plaintiff can respond to employers if he chooses but he can also put forth a lack of effort, and Plaintiff has difficulty with stress (Docket No. 12, pp. 719-724 of 767; www.healthgrades.com/provider/thomas-zeck).

On August 16, 2012, Plaintiff presented to the LCFC, complaining that he had psychological stressors emanating from the pending disability.  The pain was manifested in pain in his back, knees and hands and cramps in his right knee.  He was given Ultram for pain (Docket No. 12, p. 751 of 767).

On September 13, 2012, Plaintiff presented to the LCFC complaining of an open area on his foot and ankle swelling.  Diagnosed with a venous skin ulcer, Plaintiff was prescribed a topical ointment and an antibiotic.  The attending physician referred him to the wound clinic (Docket No. 12, p. 750 of 767).

### VI.  THE LEGAL FRAMEWORK FOR EVALUATING DIB AND SSI CLAIMS

To be eligible for DIB and/or SSI benefits, a claimant must be under a "disability" as defined by the Social Security Act.  *Collins v. Commissioner of Social Security,* 2013 WL 4482491, *4 (S.D.Ohio,2013) (*citing* 42 U.S.C. § 423(d)(1)(A)).  Narrowed to its statutory meaning, a "disability" includes physical and/or mental impairments that are both "medically determinable" and severe enough to prevent a claimant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *Id.*

Administrative regulations require a five-step sequential evaluation for disability determinations. *Id.* (*citing* 20 C.F.R. § 404.1520(a) (4)). Although a dispositive finding at any step ends the ALJ's review, *Id.* (*see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir.2007)), the complete sequential review poses five questions:

1. Has the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's RFC, can he or she perform his or her past relevant work?
5. Assuming the claimant can no longer perform his or her past relevant work—and also considering the claimant's age, education, past work experience, and RFC—do significant numbers of other jobs exist in the national economy which the claimant can perform? *Id* (*citing* 20 C.F.R. § 404.1520(a)(4); *Miller v. Commissioner of Social Security*, 181 F.Supp.2d 816, 818 (S.D.Ohio 2001)). A claimant bears the ultimate burden of establishing that he or she is "disabled" under the Social Security Act's definition. *Id.* (*citing Key v. Callahan*, 109 F.3d 270, 274 (6th Cir.1997)).

### VII. THE ALJ'S FINDINGS.

After careful consideration of the medical evidence, the legal framework for establishing disability and the entire record, the ALJ made the following findings:

1. At step one, Plaintiff met the insured status requirements of the Act through June 30, 2001. He had not engaged in substantial gainful activity since June 6, 1998, the alleged onset date.

2. At step two, Plaintiff had severe impairments, namely, attention deficit hyperactivity disorder (ADHD); borderline personality disorder; deep vein thrombosis (DVT); mood disorder; obesity; osteoarthritis of the knees; pulmonary embolism; scoliosis; and seizure disorder.

3. At step three, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Rather, Plaintiff had the residual functional capacity to perform light work, including the abilities to:

   a. Lift and/or carry up to 25 pounds occasionally;
   b. Lift and/or carry up to 10 pounds frequently;

      c.     Sit for six hours and for two hours at a time in an eight-hour workday;

      d.     Stand or walk for six hours and for 30 minutes at a time in an eight-hour workday;

      e.     Frequently push, pull and use foot pedals, balance, stoop and crouch.

      f.     Occasionally climb using ramps and stairs.

      g.     Perform simple, routine task that are low-stress, i.e., no high production quotas or piecework.

      Plaintiff must avoid:

      a.     Climbing using ladders, ropes or scaffolds;

      b.     Kneeling or crawling;

      c.     Exposure to high concentrations of smoke and fumes;

      d.     Walking in proximity to unprotected heights;

      e.     Performing complex tasks;

      f.     Work involving arbitration, confrontation and negotiation.

4.     At step four, Plaintiff was unable to perform any past relevant work.

5.     At step five, considering that Plaintiff was a younger individual with a limited education; he was able to communicate in English and his residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

6.     In conclusion, Plaintiff has not been under a disability, as defined in the Act from June 6, 1998 through April 5, 2013 (Docket No. 12, pp. 25-42 of 767).

## VIII. STANDARD OF REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*. *Norman v. Astrue,* 694 F.Supp.2d 738, 740 (N.D. Ohio 2010) *report adopted by* 2011 WL 233697 (N.D. Ohio 2011).  Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings.  *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)). "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion.  *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).

19

The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id*. at 740-741. To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Further, a district court must not focus, or base its decision, on a single piece of evidence. Instead, a court must consider the totality of the evidence on record. *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)). In fact, if there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact. *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers. *Id.* It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts." *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)). Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)). However, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

IX. ANALYSIS.

1.      DR. MANAHAN'S OPINIONS.

The ALJ gave full weight to Dr. Mahajan's opinions which included a finding that Plaintiff could sit for eight hours in an 8-hour work day, thirty minutes at a time. When assessing residual functional capacity, the ALJ determined that Plaintiff could sit for eight hours in an 8-hour work day, two hours at a time. Plaintiff asserts that the ALJ erred by failing to make an implicit rejection of this 30 minute limitation.

There is a general order of preference to first give greater weight to the opinion of a treating physician followed by an opinion from a non-treating examining physician. *Murray v. Commissioner of Social Security*, 2013 WL 5428734, *4  (N.D.Ohio,2013) (*see Ealy v. Commissioner of Social Security*, 594 F.3d 504, 514 (6th Cir.2010); *Rogers v. Commissioner*, 486 F.3d 234, 245 (6th Cir. 2007) (*citing* 20 C.F.R. §§ 404.1527(c)(1–2) & 416.927(c)(1–2) (defining "Examining relationship" and "Treatment relationship")).  With regard to non-treating, but examining sources, "the agency will simply '[g]enerally [ ] give more weight to the opinion of a source who examined [the claimant] than to the opinion of a source who has not examined' " her. *Id.* (*citing Ealy*, 594 F.3d at 514).  Notably, the procedural "good reasons" requirement does not apply to non-treating physicians. *Id.* (*citing Smith v. Commissioner of Social Security*, 482 F.3d 873, 876 (6th Cir. 2007) (explaining that "[i]mportantly ... this reasons giving requirement exists only for § 404.1527(d)(2), and not for the remainder of § 404.1527" and concluding: "[i]n the absence of treating-source status for these doctors, we do not reach the question of whether the ALJ violated *Wilson* by failing to give reasons for not accepting their reports").  The Sixth Circuit has held that the regulation requiring an ALJ to provide good reasons for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain

21

his favoring of one examining physician's opinion over another.  *Id.* (*See Kornecky v. Commissioner of Social Security*, 167 F.App'x 496 (6[th]Cir.2006)).

Beyond the fact that Plaintiff presented to Dr. Mahajan for the purpose of obtaining a completed medical source statement for the Ohio Job and Family Services, Dr. Mahajan's opinions were derived from a narrowly focused, one-time evaluation used to determine whether there were neurological symptoms and signs ascribed to Plaintiff's seizures and scoliosis.  The ALJ accorded full weight to the opinions of this non-treating, examining medical source.  The ALJ later reconciled that a finding limiting Plaintiff to a rest period every half hour, was more restrictive than reflected in Dr. Mahajan's evaluation.  Not only was such finding not based on objective medical evidence, it was markedly inconsistent with the medical evidence and Plaintiff's own testimony.  There was no medical evidence or pathological basis suggesting that Plaintiff needed a break after sitting for a ½ hour, particularly when he admitted to sitting for a large portion of the day.  Notably, he sat through the administrative hearing without taking a break after ½ hours, he did not claim that he needed such an accommodation and his counsel failed to elicit testimony that such an accommodation was required.

Plaintiff has apparently confused the standard required for explaining the weight given to a treating physician.  The ALJ was not required to give "implicit" reasons for discounting the opinions of a non-treating, examining physician.  Rather, he evaluated all of the medical opinions in accordance with regulatory factors and explained the weight given each opinion.  The ALJ's discussion about how the ALJ discounted Dr. Mahajan's opinion makes it sufficiently clear that the ALJ found that there was no medical evidence of record to support the "½ hour at a time" limitation found by Dr. Mahajan. It was not harmful error, especially in light of Plaintiff's self-reports, to make this finding.

**2.      SSR 82-59–TITLES II AND XVI: FAILURE TO FOLLOW PRESCRIBED TREATMENT.**

Plaintiff remarked that the agency attacked his character, finding that he was non-compliant with his medication regimen.  Since the ALJ made no analysis under SSR 82-59, noncompliance cannot be a basis for denial.

SSR 82–59 sets forth the policy statement of the Social Security Administrate (SSA) that a person who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the SSA determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability.  This ruling outlines the conditions that must be met before the SSA may determine that an individual has failed to follow prescribed treatment and thus is not under a disability for social security purposes.

Upon review of the record, the undersigned finds that Plaintiff had a justifiable cause for noncompliance with Coumadin therapy–he testified that he could not afford it (Docket No. 12, p. 33 of 767).  The ALJ noted that after the vena cava filter placement, Plaintiff continued to be noncompliant with the Coumadin therapy; however, there was no further evidence of recurring DVT or pulmonary embolism (Docket No. 12, p. 35 of 767).  Clearly, failure to follow prescribed treatment was not a primary issue as there is no evidence that Plaintiff would have been under a disability or that his functional limitations would have been reduced if he followed the treatment recommendations.  SSR 82-59 is not applicable to this case and was not relied upon as a basis for denial of benefits.

23

**X.  CONCLUSION**

The Magistrate recommends that this Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate Judge.


/s/Vernelis K. Armstrong
United States Magistrate Judge.

Date:   May 29, 2014

**XI.  NOTICE FOR REVIEW**

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.